# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| Plaintiff, | |
| v. | **Case No. 22-04065-01/02-CR-C-BCW** |
| **BRYAN C. PERRY**, and **JONATHAN S. O'DELL**, | |
| Defendants. | |

## <u>TRIAL BRIEF OF THE UNITED STATES</u>

**COMES NOW** the United States of America, by and through Teresa A. Moore, United States Attorney for the Western District of Missouri, and the undersigned Assistant United States Attorneys, and offers the following trial brief to assist the Court in the preparation for and trial of this case.

## <u>SUMMARY OF THE CASE</u>

Beginning in the summer of 2022, the defendants, Bryan C. Perry ("Perry") and Jonathan S. O'Dell ("O'Dell"), both members of the 2nd American Militia, conspired with each other to travel to the United States – Mexico border, go to war with and murder United States Border Patrol agents, murder illegal immigrants that crossed over the border into the United States, and recruit other individuals to help them in their illegal venture. Perry was a convicted felon[1] and O'Dell

---

[1]In 2005, Perry was convicted of the felony of aggravated robbery, in violation of T.C.A. § 39-13-402, in Montgomery County, Tennessee, case number 40400418, and was sentenced to 7.2 years in the Tennessee Department of Corrections.

was subject to a full order of protection[2] at that time, meaning both were prohibited from possessing firearms and ammunition.  Perry was also prohibited from possessing explosives and, because his felony conviction was for a crime of violence, he was further prohibited from possessing body armor.

In September 2022, Perry traveled from his residence in Tennessee to O'Dell's residence in Warsaw, Benton County, Missouri, within the Western District of Missouri, bringing with him at least two firearms and body armor, and began residing there and preparing for their travel to the border.

As a part of their conspiracy, Perry posted several videos on TikTok in an attempt to recruit other members into their conspiracy, during which he discussed the motives behind his and O'Dell's violent plans.  In further attempts to recruit others into their conspiracy, Perry contacted an individual in the state of Louisiana ("Individual #1" in the Third Superseding Indictment). O'Dell also posted a video on TikTok, discussing the need to secure the border.  In further attempts to recruit others into their conspiracy, O'Dell contacted an individual in the state of Missouri ("Individual #2" in the Third Superseding Indictment).  Perry and O'Dell also conducted other preparatory steps, including shopping for and purchasing supplies, and conducting internet searches of relevant topics.

In at least one TikTok video, O'Dell was in possession of a firearm.  During surveillance by the Federal Bureau of Investigation ("FBI") in September and October 2022, both O'Dell and Perry were seen carrying firearms in the Warsaw, Missouri area.

_____

[2]*P.O. v. Jonathan O'Dell*, case number 22RY-CV00106, Ray County, Missouri Circuit Court.

Around October 2, 2022, O'Dell began communicating with an individual ("Individual #3" in the Third Superseding Indictment) over the telephone. During that recorded phone call and others, O'Dell was located in the state of Missouri and Individual #3 was located outside the state of Missouri. O'Dell detailed his and Perry's plan to go to the border and asked Individual #3 to acquire supplies for their plan, including ham radios and night vision goggles. O'Dell also discussed with Individual #3 whether and when Individual #3 could join them. During the October 2, 2022, phone call, O'Dell communicated several threats to Individual #3, which are the subject of Count 43 of the Third Superseding Indictment (hereinafter, "Indictment").

On October 3, 2022, Perry, while located in the state of Missouri, began communicating with an individual who was also located outside the state of Missouri ("Individual #4" in the Indictment). During phone calls with that individual, Perry detailed his and O'Dell's plans regarding the border and discussed their need for equipment. During a phone call on October 3, 2022, Perry communicated several threats to Individual #4, which are the subject for Count 41 of the Indictment.

O'Dell and Perry later communicated to others that they were going to travel to the border on October 8, 2022, to carry out their plan. Between October 3, 2022, and October 7, 2022, the two continued to conduct preparatory steps to further their conspiracy, including continuing to recruit others, communicating with Individuals #3 and #4, and practicing shooting at targets with firearms. The aforementioned details, along with those below, relate to the defendants' conspiracy charges in Counts 1 through 3 of the Indictment.

On October 7, 2022, the FBI executed a federal search warrant at O'Dell's residence in Warsaw, Missouri. FBI agents approached the residence at approximately 6 a.m. to execute the

search warrant. They approached in various FBI vehicles, with blue and red emergency lights and a loudspeaker in operation. During their approach of the residence, an agent utilized a loudspeaker in the lead armored vehicle, the "Bearcat," to announce they were the FBI and that they had a search warrant for the residence. Seven agents were inside or behind the Bearcat. After the agent made his announcement for the first time and while the Bearcat was still approaching the residence, Perry used a Voodoo Innovations multi-caliber rifle with an Anderson Manufacturing, model AM-15, lower receiver, bearing serial number 21221464, to fire shots at the agents. Agents responded by deploying flash bangs around the residence. Perry continued to shoot at the agents, firing 11 rounds in all, and approximately three rounds hit the Bearcat. One of these three rounds hit the windshield of the vehicle and approximately two rounds hit the turret on top of the vehicle, where an agent was positioned.

FBI agents did not return fire and the agents used the Bearcat to conduct a breach of the front door of the residence using an affixed ram. After the gunshots ceased and the front door was breached, the FBI established a perimeter and began communicating with the persons inside the residence to come out. Subsequently, O'Dell and his girlfriend, Savannah Mooney ("Mooney"), exited the residence and surrendered. Another individual, Thor Moceri ("Moceri"), was located in a large unattached garage on the property.

Agents continued to call Perry out of the residence and deploy flashbangs. Perry then appeared in the front doorway with a cell phone in his hand. Perry took down an American flag from the front porch of the residence and walked down the steps while waving the flag. After beginning to walk to the agents, Perry then turned around and moved back to the residence. Agents pursued Perry and contacted him. Perry began to fight and swing his fists, striking the agents

4

several times and causing injury to at least one agent, which is relevant to Counts 18 through 20 of the Indictment. Agents eventually took Perry into custody.

Agents then searched the residence and found approximately six firearms, 23 magazines filled with ammunition, 1,770 rounds of various other ammunition, 11 spent casings, two sets of body armor with corresponding plate carrier vests, one handheld radio, two sniper rests, two gas masks, two items appearing to be ballistic helmets, multiple containers of a binary explosive mixture commonly sold as an exploding target, and at least two 2nd American Militia patches. Included in those items was the aforementioned Voodoo Innovations multi-caliber rifle, which is the subject of Counts 4 through 17, 21 through 34, 35, and 36 of the Indictment, and the following:

      a)     a Ruger, model Security-9, 9 mm caliber pistol, bearing an obliterated serial number, possessed by Perry and which is the subject of Counts 37 and 38 of the Indictment;

      b)     a Stevens, model 320, 12-gauge firearm, bearing serial number 142729C, possessed by O'Dell and which is the subject of Count 42 of the Indictment;

      c)     an Armored Republic Level III model body armor, with markers 3X12FR and A70-42, which is the subject of Count 39 of the Indictment; and

      d)     a mixed material that contained a high explosive mixture of ammonium nitrate prills and aluminum powder, which is the subject of Count 40 of the Indictment.

Each of the above-listed firearms were found by a special agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives to have been manufactured outside the state of Missouri. Body armor, which is the subject of Count 39, and explosives, related to Count 40, were found in Perry's room.

Upon detention, Perry made an unsolicited statement that, "[The shooting is] on me, I own it." Perry asked the agents if they were there for him. An agent responded they had a search warrant for the house because of a belief that he and others were planning to go to the southern border to shoot immigrants and federal law enforcement officers. Perry then stated, "If they'd do their job, we wouldn't have to." Perry then said that he wished the agents had shot him because then he would be a martyr.

Later, agents heard O'Dell tell Perry that he had been ready to die. Perry responded that he knew that was the case and said he also knew he was going away for a long time.

Agents interviewed Perry after reading to him his *Miranda* rights. During that interview, Perry acknowledged he was going to the border and said he represents the "red flag." He stated he was going to the border on Saturday (October 8) and he was not going by himself. Perry confirmed he was a convicted felon and stated that his ex-girlfriend had got him the rifle. Perry stated, "There's a war coming."

Agents also conducted a post-*Miranda* interview of O'Dell. During that interview, O'Dell stated that he knew Perry had tried to kill the agents that morning. He said that Perry had made statements in the past about killing "cops." O'Dell said that when the agents arrived this morning, he was sleeping on a couch and Perry came out of his room and said, "Let's fucking kill them. They're here. Do you want to get in a gunfight?" O'Dell said Perry brought a vest, a rifle, and a handgun with him from Tennessee. O'Dell told the agents that he owned the Stevens firearm but said he did not possess any firearms that he could carry on his person. That statement, which is the subject of Count 44 of the Indictment, was later determined to be false after agents found a 9 mm firearm wedged in between the cushions of the couch O'Dell said he had been sleeping on

that morning. O'Dell also stated that he might have said that he was going to the border with Perry and that he invited Perry to Missouri and gave him a home, food, shelter, and a job.

Mooney later told agents that O'Dell possessed a pistol and a shotgun. Gunshot residue tests were later conducted on Perry and the results indicted the presence of residue on Perry's hand. The Bearcat suffered approximately $2,922.98 in damages from Perry's gunshots, which is relevant to Count 35 of the Indictment.

Agents seized O'Dell and Perry's cellular telephones and searched the devices for further evidence. In Perry's phone, agents found photographs of the rifle he used to shoot at the FBI on October 7, 2022, and the body armor agents found in his bedroom. Agents also found text messages between O'Dell and Perry, and between Individual #4 and Perry, and TikTok messages between Individual #1 and Perry. Perry's call log also corroborated the phone calls he held with Individual #4. In O'Dell's phone, agents found TikTok messages with Individual #2, Telegram messages with Individual #4, and text messages with Perry. O'Dell's call log also corroborated the phone calls he held with Individual #3.

After Perry and O'Dell were charged with these criminal acts in the United States District Court for the Western District of Missouri, they were each ordered detained pending trial. On September 29, 2023, O'Dell was housed in the Phelps County, Missouri Jail. During the early morning hours of September 30, 2023, Phelps County Jail personnel noticed that O'Dell and another inmate had escaped from the jail. Staff observed damage to the ceiling of a cell and concluded that O'Dell and the other inmate had escaped through the ceiling of that cell. Phelps County video surveillance showed O'Dell leaving the jail through the building's public entrance

around 11:00 p.m. on September 29, 2023.  The video showed that O'Dell had changed into jail staff clothing.

Subsequent investigation by multiple law enforcement agencies concluded that O'Dell stole a vehicle in Rolla, Missouri thereafter and traveled to Ray County, Missouri, within the Western District of Missouri, where he contacted an individual at their residence for assistance on October 1, 2023.  That individual then contacted law enforcement.  Law enforcement converged on the area around the individual's residence and observed O'Dell driving the stolen vehicle.  As the officers attempted to conduct a traffic stop of O'Dell, he fled law enforcement at a high rate of speed but was eventually taken into custody.  These facts relate to Count 45 of the Indictment.

Both defendants have pleaded not guilty to each charge and the United States plans to present numerous law enforcement, civilian, and expert witnesses, along with numerous exhibits to prove that each defendant is guilty beyond a reasonable doubt of each crime charged against them.

## PRETRIAL FILINGS AND PENDING MOTIONS

On September 27, 2024, the United States filed its "Notice of Intention to Rely on Other Acts of a Similar Nature," pursuant to Rule 404(b) of the Federal Rules of Evidence.  (Doc. 84.) On the same date, the United States filed, under seal, its "Motion for Protective Order."  (Doc. 96.) The United States also filed two motions *in limine* on October 17, 2024, regarding various potential trial issues.  (Doc. 114, 115.)  The parties submitted Joint Proposed Jury Instructions on October 15, 2024.  (Doc. 111.)  Neither defendant has filed any pre-trial motions, though Defendant Perry filed an objection to the United States' 404(b) motion on October 17, 2024.  (Doc. 113.)

8

## APPLICABLE LAW

### A.    Count 39 – "crime of violence"

Count 39 charges Defendant Perry with possessing body armor "after having been convicted of a felony that is a crime of violence . . .", in violation of 18 U.S.C. §§ 931 and 924(a)(7). (Doc. 48.) Title 18, United States Code, Section 16, defines "crime of violence" as

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Perry was convicted in 2005 in the state of Tennessee of aggravated robbery, in violation of T.C.A. § 39-13-402, for an offense that occurred on April 15, 2004.

Now, and at the time of the defendant's prior felony offense, Tennessee Code Annotated Section 39-13-401 set out that robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (1990). Section 39-13-402 defined aggravated robbery as "robbery as defined in § 39-13-401: (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or (2) Where the victim suffers serious bodily injury." T.C.A. § 39-13-402 (1989).

Federal courts have found that a conviction for aggravated robbery under T.C.A. § 39-13-402 qualifies as a violent felony for Armed Career Criminal purposes. *United States v. Bailey*, 634 Fed.Appx. 473 (6th Cir. 2015).[3]  In fact, *United States v. Mitchell*, 743 F.3d 1054 (6th Cir.

---

[3]*Bailey* used the definition of "violent felony" from 18 U.S.C. § 924(e)(2)(B), which included the language "any crime . . . that – (i) has an element the use, attempted use, or threatened use of physical force against the person of another," in finding that the Tennessee aggravated robbery statute qualified under this use-of-force clause.

9

2014), held that even a Tennessee conviction for robbery qualifies as a violent felony under the use-of-force clause. *See also United States v. Belcher*, 40 F.4th 430 (6th Cir. 2022). Additionally, convictions for solicitation to commit aggravated robbery under T.C.A. § 39-12-102, *United States v. Walker*, 181 F.3d 774 (5th Cir. 1999), and facilitation of aggravated robbery under T.C.A. § 39-11-403(a), *United States v. Dorsey*, 91 F.4th 453 (6th Cir. Jan. 23, 2024), qualify as crimes of violence under the career offender sentencing guideline.

The parties' Joint Proposed Jury Instructions, (Doc. 111), includes a Verdict Director for Count 39, which contains the following language: "For purposes of this Instruction, the defendant's conviction of aggravated robbery in the state of Tennessee is a crime of violence." Neither defendant objected to this instruction. Accordingly, Perry's Tennessee conviction for aggravated robbery meets the definition of crime of violence under Title 18, United States Code, Section 16, and this Court should so instruct the jury in its Verdict Director for Count 39.

B. **Count 40 – explosive "in or affecting commerce"**

Count 40 charges Defendant Perry with possessing an explosive as a convicted felon, in violation of 18 U.S.C. §§ 842(i)(1) and 844(a)(1). (Doc. 48.) Title 18, United States Code, Section 842(i)(1) makes it a crime for a convicted felon "to . . . possess any explosive which has been shipped or transported in or affecting interstate . . . commerce."

The Government expects the evidence to show that Perry, a convicted felon, possessed at least three containers of a high explosive mixture of ammonium nitrate prills and aluminum powder. Notably, the Government does not have to show that the explosive mixture crossed state lines, as § 842(i) "prohibits the *intrastate* possession of explosives by individuals with prior felony convictions." *United States v. Wright*, 2023 WL 1113154, at *3 (W.D. Va. 2023) (emphasis added)

(further stating that "the prohibitions in 18 U.S.C. § 842(i) apply to the purely personal intrastate . . . possession of explosives by . . . those with prior felony convictions."); *see also United States v. Dawson*, 467 F.2d 668, 673 (8th Cir. 1972) (Because Congress could rationally conclude that "the misuse of explosive materials is one activity which, as a class, affects commerce, the Government need not specifically allege and prove a connection between interstate commerce and the conduct made criminal by § 842."); *United States v. Luhrs*, 4:10-cr-78, Doc. 40 (S.D. Ia. 2010) (finding that § 842 is part of a larger regulatory scheme that regulates economic activity and, thus, Congress could validly regulate a prohibited possessor's intrastate possession of an explosive.). These cases have found that the phrase "affecting interstate commerce" shows Congress's intent to exercise its full power under the Commerce Clause, which includes reaching "purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Wright*, 2023 WL 1113154, at *3 (quoting *Taylor v. United States*, 579 U.S. 301, 307 (2016)). Congress's regulation of explosives, much like that of firearms and drugs, is permissible because the misuse of explosives has a substantial effect on interstate commerce. *United States v. Lechner*, 806 F.3d 869, 877-78 (6th Cir. 2015).

The parties' Joint Proposed Jury Instructions, (Doc. 111), includes a Verdict Director for Count 40, which contains the following language: "You are instructed that possession of a mixed material that contained a high explosive mixture of ammonium nitrate prills and aluminum powder affects interstate commerce." Neither defendant objected to this instruction. Therefore, this Court should so instruct the jury and further instruct that Element Four of the Verdict Director for Count 40 has been proven.

11

### C.     Counts 41 and 43 – "true threat"

Each defendant is charged with communicating a threat to injure, in violation of 18 U.S.C.

§ 375(c) – Defendant Perry in Count 41 and Defendant O'Dell in Count 43.  Eighth Circuit Model

Criminal Jury Instruction (2013) No. 6.18.875C requires the Government to prove that each

defendant communicated what a reasonable person would view as containing a true threat to injure

another person.  The Government expects the evidence to show that Perry communicated a true

threat to Individual #4 on or about October 3, 2022, and O'Dell communicated a true threat to

Individual #3 on or about October 2, 2022.  The Government also expects the evidence to show

that Individuals #3 and #4 were working with law enforcement in their investigation of the

defendants and their conspiracy.  Threats communicated to accomplices or co-conspirators,

including confidential informants viewed at the time by a defendant as an accomplice or co-

conspirator, in the context of planning violence can be true threats.  *United States v. Dougat*, 906

F.3d 506, 511-12 (6th Cir. 2018) (citing *United States v. Spring*, 305 F.3d 276, 280-81 (4th Cir.

2022) & *United States v. Siegler*, 272 F.3d 975, 978 (7th Cir. 2001)).  Therefore, Perry and

O'Dell's true threats communicated to Individuals #3 and #4 can qualify as true threats.

### D.     Count 45 – escape is a continuing offense

Under Count 45, Defendant O'Dell is charged with escape from custody, in violation of 18

U.S.C. § 751(a).  The Government expects the evidence to show that O'Dell escaped from the

Phelps County Jail, in Rolla, Phelps County, Missouri, a location within the Eastern District of

Missouri, on or about September 29, 2023.  The evidence will also show that law enforcement

found O'Dell in Ray County, Missouri, within the Western District of Missouri, on or about

October 1, 2023.  Upon law enforcement attempting to contact O'Dell, he fled in a stolen vehicle

at a high rate of speed, driving erratically through a small town and on country roads, ultimately stopping his vehicle only when he was blocked in by law enforcement.

"Escape from federal custody as defined in § 751(a) is a continuing offense, and an escapee can be held liable for failure to return to custody as well as for his initial departure." *United States v. Bailey*, 444 U.S. 394, 413 (1980); *see also United States v. Cluck*, 542 F.2d 728, 732 (8th Cir. 1976) ("Even if such person leaves his place of confinement involuntarily or inadvertently, nevertheless if at a later time he voluntarily forms an intent to remain at large and acts upon it, that is sufficient to sustain a conviction for escape"); *United States v. Gonzalez*, 495 F.3d 577, 580 (8th Cir. 2007) (noting that *Bailey* "explicitly included the failure to return to custody as part of the escape offense"). Accordingly, even though O'Dell first escaped from custody in the Eastern District of Missouri, his failure to return to custody when contacted by law enforcement in the Western District of Missouri and his intent to remain at large, as exhibited by his high-speed flight from law enforcement, shows his violation of § 751 in the Western District of Missouri. O'Dell can be convicted of Count 45 under this Court's jurisdiction.

## OTHER RELEVANT LEGAL AUTHORITY

At trial, the United States anticipates the defendants may raise objections to the introduction of certain evidence and statements at trial. What follows is a summation of the relevant authority regarding these issues in advance of trial.

### A.    Statements of the Defendant and Self-Serving Hearsay

In the course of the United States' case-in-chief, during cross-examination of potential defense witnesses, including each defendant, and possibly in rebuttal, the United States may offer

13

into evidence out-of-court statements made by the defendants. Fed. R. Evid. 801(d)(2)(A) provides:

> **(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:
>> **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:
>>> (A) was made by the party in an individual or representative capacity. . .

These statements are admissible since they were made voluntarily and qualify as non-hearsay given their status as admissions. By contrast, since they are not party opponents to themselves, defendants may not elicit evidence of their own out-of-court statements or those of their agents or co-conspirators. *See United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008). This holds true even where inculpatory parts of the same conversation are offered by the United States. *See, e.g., Williamson v. United States*, 512 U.S. 594, 600 (1994); *United States v. Smith*, 794 F.2d 1333, 1335-36 (8th Cir. 1986).

Federal Rule of Evidence 801(c) defines hearsay as a statement that a declarant does not make while testifying at the current trial and is offered by the party to prove the truth of the matter asserted. FED. R. EVID. 801(C)(1) and (2). An attempt by a defendant to elicit an exculpatory statement made by the defendant to a witness who then testifies at trial would qualify as hearsay under Fed. R. Evid. 801. This type of testimony is considered hearsay under Fed. R. Evid. 801(c) and is not one of the enumerated exceptions under Fed. R. Evid. 803, nor is there a specific federal statute, Federal Rule of Evidence, or other rule prescribed by the Supreme Court that would allow the admission of such a statement.

The purpose of offering any testimony by a third party as to exculpatory statements by a defendant would be to prove the truth of the matter asserted, namely, the innocence of the

14

defendant. In *United States v. Chard*, a defendant sought to admit exculpatory statements made by another defendant to a federal agent. 115 F.3d 631, 634-35 (8th Cir. 1997). The Eighth Circuit held that out-of-court exculpatory statements by a third party are hearsay and should be excluded as such. *Id.* at 635.

### B.    False Exculpatory Statements

The Government contends that both defendants made false exculpatory statements during *Mirandized* statements to investigators and others. The Government intends to present this evidence through the testimony of witnesses and Government exhibits. "False exculpatory statements are properly admissible as substantive evidence tending to show guilt." *United States v. Hudson*, 717 F.2d 1211 (8th Cir. 1983) (citing *United States v. Bear Killer*, 534 F.2d 1253, 1260 (8th Cir. 1976)); *United States v. Merrill*, 484 F.2d 168, 170 (8th Cir. 1973); *Rizzo v. United States*, 304 F.2d 810, 830 (8th Cir. 1962).

The Eighth Circuit has held that a "false exculpatory statement instruction is properly given when a defendant's exculpatory explanation is later proven to be false." *United States v. Penn*, 974 F.2d 1026, 1029 (8th Cir. 1992) (citing *United States v. Wells*, 702 F.2d 141, 144 (8th Cir. 1983)). The Eighth Circuit has recognized that the "false exculpatory statement instruction is aimed at pretrial fabrications, on the theory that the innocent do not fabricate to avoid being accused of crime." *United States v. Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995) (also stating that, "It is universally conceded today that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."). The parties have jointly proposed a jury

instruction based on the Eighth Circuit Model Instruction 4.15, to cover false exculpatory statements. (Doc. 111.)

## C. Co-Conspirator Statements

The Government plans to present evidence of co-conspirator statements at trial, including: a) text messages and other electronic messages between the defendants; b) text messages and other electronic messages between each defendant and third parties; c) recordings of phone calls held between Perry, O'Dell, and Individual #4, and O'Dell and Individual #3; d) other statements made by the defendants to Individuals #3 and #4; e) other statements made between the defendants; f) statements made by the defendants to other third parties; g) recorded social media messages of the defendants; and h) a recorded voicemail Perry left for the Office of the Governor of Texas.

Federal Rule of Evidence 801(d)(2)(E) provides that co-conspirator statements may be admitted for truth when made during and in furtherance of a conspiracy in which the person making the statement and the defendant were members. *United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978). A conspiracy need only be shown by a preponderance, *United States v. Spotted Elk*, 548 F.3d 641, 661 (8th Cir. 2008), and statements may be admitted conditionally pending receipt of additional evidence. *United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014) (citing *Bell*, 573 F.2d at 1044). Therefore, government must establish by a preponderance of the evidence that 1) a conspiracy existed, 2) both the declarant and defendants were members of it, and 3) the declarant made the statement in the course and in furtherance of the conspiracy. *United States v. Hyles*, 521 F.3d 946 (8th Cir. 2008); *United States v. Mahasin*, 362 F.3d 1071, 1084 (8th Cir. 2004). An out of court statement is not hearsay if it is offered against a defendant in a conspiracy case and in furtherance of the conspiracy. *United States v. Cathey*, 997 F.3d 827, 834 (8th Cir. 2021).

16

To prove the existence of a conspiracy the court may consider the contents of the statement themselves, but the government must also produce independent evidence outside of the statements to show an existing conspiracy. *United States v. Ramirez-Martinez*, 6 F.4th 859 (8th Cir. 2021); *United States v. Mayfield*, 909 F.3d 956, 960 (8th Cir. 2018). This independent evidence needed to establish the existence of a conspiracy may be entirely circumstantial. *United States v. Whitlow*, 815 F.3d 430, 434 (8th Cir. 2016).

Courts interpret the in-furtherance-of requirement "broadly." *United States v. Meeks*, 756 F.3d 1115, 1119 (8th Cir. 2014) (quoting *United States v. Davis*, 457 F.3d 817, 825 (8th Cir. 2006)); *United States v. Manfre*, 368 F.3d 832, 839 (8th Cir. 2004). Although there is no precise formula on what constitutes "in furtherance" of a conspiracy, a statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy. *United States v. Ford*, 839 F.3d 94 (1st Cir. 2016). Statements that conceal a conspiracy and those that "serve to maintain trust and cohesiveness" rise to this level. *United States v. Tremusini*, 688 F.3d 547, 555 (8th Cir. 2012). Statements need not have been made from one conspirator to another. *United States v. Dinwiddie*, 618 F.3d 821, 836 (8th Cir. 2010). Nor must they be offered at trial by a member of the conspiracy. *Id*. Availability of the declarant is immaterial. *United States v. Gardner*, 447 F.3d 558, 560-61 (8th Cir. 2006) (citing *United States v. Inadi*, 475 U.S. 387, 391 (1986)).

### D.     Judicial Notice

The United States may request that the Court take judicial notice of Defendant O'Dell's "Order of Detention Pending Trial", (Doc. 11), pursuant to Federal Rule of Evidence 201, due to its relevance to his escape from custody charge under Count 45. Rule 201 states that, "[t]he court

may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court can "take judicial notice, whether requested or not . . . of its own records and files, and facts which are part of its public records . . . ." *United States v. Jackson*, 640 F.2d 614, 617 (8th Cir. 1981) (quoting *St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979)); *see also Rose v. Beverly Health and Rehabilitation Services, Inc.*, 356 B.R. 18, 22 (E.D. Ca. 2006) (citing *Miles v. State of California*, 320 F.3d 986, 987 (9th Cir. 2003)) (A federal district court can take judicial notice of public records related to legal proceedings in both state courts and federal district courts); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260 (5th Cir. 1978) (citing Rule 201 in finding no error in a district court's notice of materials in its own files from prior proceedings). O'Dell's detention order, a certified copy of which will be marked as a Government trial exhibit, comes from this Court's own file, which is within its territorial jurisdiction. The order is also accurately and readily determined from the office of the Clerk of the United States District Court for the Western District of Missouri through such certification. A related joint proposed jury instruction has been submitted pursuant to Federal Rule of Evidence 201(f), based on the Eighth Circuit Model Instruction 2.04. (Doc. 111.)

     **E.**     **Not Hearsay**

Out-of-court statements may also be introduced at trial for reasons other than their truth. Statements offered as such are not hearsay and, in turn, present no issues under *Crawford v. Washington*, 541 U.S. 36 (2004). Fed. R. Evid. 801(c)(2); *United States v. Yielding*, 657 F.3d 688, 700 (8th Cir. 2011). Examples that may arise at trial include background information about the

origin of an investigation, *United States v. Kenyon*, 481 F.3d 1054, 1063 (8th Cir. 2007), statements offered to explain police action, *United States v. Campbell*, 764 F.3d 880, 891 (8th Cir. 2014), statements that provide circumstantial evidence about state of mind, *United States v. Hyles*, 479 F.3d 958, 969 (8th Cir .2007), and material found during searches offered as circumstantial evidence of a defendant's knowledge, *see United States v. Redd*, 2009 WL 348831, at *13 (5th Cir. 2009) (seized documents admissible "to show where they were found and that [the defendant] was aware of the conspiracy").

### F. <u>Business Records</u>

The Government's evidence in its case-in-chief will also include documents offered under Federal Rule of Evidence 803(6). "A knowledgeable document custodian 'need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information.'" *United States v. Voice*, 622 F.3d 870, 879 (8th Cir. 2010) (quoting *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010)). Records admitted under the rule "are non-testimonial statements to which the Confrontation Clause does not apply." *United States v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010) (citations omitted). This is so even when offered without live testimony under Rule 902(11).[4] *United States v. Thompson*, 686 F.3d 575, 581-82 & n.6 (8th Cir. 2012). Challenges to the accuracy or completeness of such records go to weight, not admissibility. *See Wilson v. United States*, 352 F.2d 889, 890-91 (8th Cir. 1965) (citing *La Porta v. United States*, 300 F.2d 878, 880 (9th Cir. 1962)).

---

[4]The United States gave formal notice of its intent to offer such records, and that of public records, on October 11, 2024. (Doc. 104, 106.)

The United States may introduce copies in lieu of original records. Duplicates are regularly received into evidence absent a "genuine question" about authenticity of the original. *United States v. Stockton*, 968 F.2d 715, 719 (8th Cir. 1992) (quoting FED. R. EVID. 1003). Here, the United States foresees none.

## G. Chain of Custody

The chain of custody does not have to be perfect; all that is required is testimony that the evidence remains the same as it was and that it is substantially unchanged. *United States v. Johnson*, 688 F.3d 494, 506 (8th Cir. 2012). Generally, physical evidence may be admitted if a chain of custody is established that shows a reasonable probability that the evidence had not been changed or altered. *United States v. Manning*, 738 F.3d 937 (8th Cir. 2014). In resolving chain of custody issues, the Eighth Circuit presumes that custodians have preserved the integrity of the evidence absent a sufficient showing of bad faith, ill will, or proof of tampering. *Id.*

A defect in the chain of custody affects the weight of the evidence rather than its admissibility. *United States v. Brumfield*, 686 F.3d 960, 965 (8th Cir. 2012). The government does not need to provide live testimony for every step in the chain of custody unless it makes those steps a crucial issue. *United States v. Burrage*, 951 F.3d 913, 915 (8th Cir. 2020), *reh'g denied* (Apr. 7, 2020) (holding submitting a lab report had not created a crucial chain of custody issue when the government had not questioned witnesses about the lab's evidence-handling procedure).

## H. Testimony or Evidence as to Sentencing Consequences

A district court is not required to instruct a jury about the sentencing consequences of its verdict. Doing so would invite jurors "to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."

20

*Shannon v. United States*, 512 U.S. 573, 580 (1994). Only when a jury has a sentencing function can it reach a verdict about what sentence might be imposed. *Id.* This is to ensure the basic division of labor in our legal system between judge and jury are kept intact; where the jury's function is to find the facts and decide guilt and a judge imposes a sentence on a defendant if the jury finds him or her guilty. *Id.*

Therefore, sentencing procedures are typically irrelevant to the issues that a federal jury may have to decide and introducing information about a defendant's punishment would only introduce improper and confusing considerations for them to consider. *United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990). For example, an appellate court found that a district court had not abused its discretion when it refused to instruct the jury about a defendant's potential punishment of a ten-year sentence because if it had allowed such an instruction, it would have invited the jury to be distracted from their factfinding responsibilities. *United States v. Lora-Andres*, 844 F.3d 781, 785 (8th Cir. 2016).

I.   **Testimony by Expert Regarding Independent Conclusions**

An expert witness testifying as to his or her independent conclusions derived from another scientist's test results does not violate the Confrontation Clause of the Sixth Amendment. *United States v. Richardson*, 537 F.3d 951, 960 (8th Cir. 2008) (citing *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008)). "The Sixth Amendment does not demand that a chemist or other testifying expert have done the lab work himself." *Id.* As the *Richardson* case demonstrates, when a second expert uses reports of another expert in forming his or her opinion, so long as the second expert comes to his or her own independent conclusion, the second expert's testimony is not hearsay and can be admitted without violating the Confrontation Clause. *Id.* at 961.

21

**J.**     **Installment Witness Testimony**

To coherently present some of its trial evidence, the Government may seek leave of court to present the testimony of some witnesses in installments, including FBI Special Agent Isaac McPheeters. Fed. R. Evid. 611 provides that the trial court, "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

This rule fits well against a broad backdrop of case law providing that a trial judge has broad discretion over the manner and presentation of proof at trial. If a procedure employed at trial makes sense, saves time, and does not impact the substantial rights of a defendant, any procedure will almost always withstand appellate scrutiny.

Specifically, the Eighth Circuit has repeatedly upheld the repeated recall of witnesses in complex criminal cases where the witness provided "installment" or count-by-count testimony and the defendant has a full and fair opportunity to cross-examine the witness. *United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998) (no abuse of discretion to repeatedly recall law enforcement witnesses in drug conspiracy case where procedure allowed chronological presentation of evidence); *United States v. DeLuna*, 763 F.2d 897, 911-12 (8th Cir. 1985) (no abuse of discretion to repeatedly recall government witness in casino skimming case where each installment concerned different subject matter and defense allowed to cross examine at end of each installment); *United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977) (repeated recall of government agent not an abuse of discretion where tactic ensured orderly presentation of proof in drug conspiracy case).

The Government will not recall a witness to plow the same ground over and over again, or to bolster the witness' testimony. *See, e.g., Puckett*, 147 F.3d at 770 (upholding repeated recall where no indication of witness bolstering); *DeLuna*, 763 F.2d at 911-12 (court cautioned government that each installment must relate to new subject and sequence of events and witness cannot clarify prior testimony during later installments).

When the government presents evidence through the repeated recall of a witness, the trial court should make a defendant choose between withholding all cross-examination to the end of the witness' testimony, or limiting cross examination at the end of each installment to the subject of the installment. *Jackson*, 549 F.2d at 528 (cross examination limited to subject matter of each installment and credibility of witness with final appearance of witness allowing cross examination on all topics); *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (where government presented evidence count by count with repeated recall of witnesses, defense could either cross examine on the subject matter of each installment or wait until end of testimony and cross examine on all subjects).

If the trial court limits the defense cross examinations of the recall witness, a defendant should not be permitted to engage in repetitive cross examinations or attempt to impeach future witnesses through the recall witness. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371-72 (11th Cir. 1994) (cannot impeach future witnesses that have not yet testified).

### K.    Hostile Witnesses

It is anticipated that at least one government witness may be a hostile witness when called by the Government to testify in its case-in-chief. Federal Rule of Evidence 611(c) provides that:

**Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions: . . .

> (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

The case law in the Eighth Circuit is supportive of the position that, when confronted with a hostile witness or a witness identified with an adverse party, it is permissible for the trial court to allow the prosecution to use leading questions. *See e.g., United States v. Farlee*, 757 F.3d 810 (8th Cir. 2014) (upholding Government's use of leading questions with a witness who was in a relationship with defendant who hesitated and delayed in her answers to questions); *United States v. Stelivan, et. al*, 125 F.3d 603, 608 (8th Cir. 1997) (concluding that the trial court did not abuse its discretion by allowing the prosecution to use leading questions when dealing with a witness who had become inarticulate and evasive); *United States v. Shursen, et. al*, 649 F.2d 1250, 1254 (8th Cir. 1981) (explaining that when confronted with hostile witnesses whose answers were inconsistent and evasive, the use of leading questions by the prosecution was necessary). The extent to which leading questions are permissible is typically a matter that is left to the sound discretion of the trial court and will only be disturbed on appeal when that discretion is abused. *Stelivan*, 125 F.3d at 608.

Therefore, should any witness become hostile, the Government will be requesting the court to exercise its discretion pursuant to Federal Rule of Evidence 611(c) and permit the use of leading questions.

## L. <u>Statements of Others in Text Messages and Other Electronic Messages</u>

The Government expects to present evidence of information extracted from Perry and O'Dell's cell phones, including text messages and messages from various applications. These

messages will contain both incoming and outgoing text messages and the messages from others would be offered as non-hearsay to supply context to the defendants' own statements.

The Eighth Circuit has held on multiple occasions that statements by third parties in chat conversations are non-hearsay when offered to provide context for the defendant's responses. In *United States v. Cooke*, 675 F.3d 1153 (8th Cir. 2012), the government was permitted to admit a statement from a non-testifying witness. The Eighth Circuit held that this statement was "not hearsay, because it was not offered for its truth, but to provide context for Cooke's response." *Cooke*, 675 F.3d at 1156 (citations omitted).

Two years later, the Eighth Circuit would reaffirm another conviction, finding that the admission of chat conversations under similar circumstances was permissible as they were non-hearsay statements offered for context. In *United States v. Manning*, 738 F.3d 937, 943-44 (8th Cir. 2014), the Eighth Circuit held that "statements of the unknown parties to the chat conversations with Manning were not hearsay because the statements were not offered for their truth but rather to provide context for Manning's responses." *Manning*, 738 F.3d at 943. Citing its rationale in *Cooke*, the Court noted that an "unknown person's statement provided context for the defendant's response and that the truth of the statement was immaterial." *Id*. (citing *Cooke* and *United States v. Burt*, 495 F.3d 733, 738-39 (7th Cir. 2007)). *Manning* ultimately held that

> The same analysis applies to this case. The statements of the unknown participants in the chat conversations found on Manning's computer were not offered for their truth, but to provide context for Manning's responses—responses that revealed Manning's identity, his preferences for different types of child pornography, and his desire to exchange child pornography with other people online. The district court was within its discretion in admitting the conversations.

*Id*. at 944.

The defendants' own statements are admissible as non-hearsay admissions of a party opponent. Excluding the statements of others would deprive the jury of necessary and relevant context as to the defendants' responses.

## SUMMATION

Wherefore, in light of the foregoing authorities, the United States respectfully submits to the Court this Trial Brief, and asks that it consider and adopt these interpretations of the law. The United States is prepared to prove the defendants' guilt of all charges beyond a reasonable doubt.

Respectfully submitted,

TERESA A. MOORE
United States Attorney

By     */s/ Casey Clark*
Casey Clark
Missouri Bar #57968

*/s/ Ashley Turner*
Ashley Turner

Assistant United States Attorneys
901 St. Louis Street, Ste. 500
Springfield, Missouri 65806-2511

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered October 21, 2024, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

*/s/ Casey Clark*
Casey Clark
Assistant United States Attorney

26